Edward **BOLAM, et al.,**
**Plaintiffs–Appellants,**

v.

**MOBIL OIL CORPORATION,**
**Defendant–Appellee.**

No. 89–3033.

United States Court of Appeals,
Eleventh Circuit.

Jan. 29, 1990.

As Amended Feb. 26, 1990.

**312**

Albert J. Barr, Stamford, Conn., for plaintiffs-appellants.

Paul D. Newnum, Giles, Hedrick & Robinson, P.A., Orlando, Fla., Hogan & Hartson, Edward C. Duckers, Washington, D.C., for defendant-appellee.

Before ANDERSON and EDMONDSON, Circuit Judges and HENDERSON, Senior Circuit Judge.

PER CURIAM:

Appellants, a group of Mobil service station dealers ("Dealers"), contend that Mobil Oil Corporation ("Mobil") had a legal obligation to bill them for the temperature compensated volume of gasoline as opposed to billing for the actual volume delivered. Mobil opposed this claim on the grounds that Florida law does not require temperature compensated invoicing. The district court granted summary judgment to Mobil on the question of whether Florida law required Mobil to bill Dealers for temperature compensated gasoline.

Prior to January 1, 1987, Mobil provided gasoline to Dealers, billing for that gasoline on the basis of gallons without adjusting the volume for the temperature of the gasoline.[1] The contracts between Mobil and Dealers provide for payment for the gasoline by the gallon; however, the Supply Agreements fail to define the term, "gallon." Mobil's gasoline dispensing equipment is equipped with automatic temperature compensating devices capable of measuring the adjusted volume of the gasoline as if it had been dispensed at 60 degrees Fahrenheit.

The parties agree that the facts are undisputed. In addition, Dealers concede that, if there is no contrary Florida requirement, the contract is properly construed to require payment on the basis of gallons without any temperature adjustment. However, Dealers contend that temperature compensated billing is required by Florida statute. Therefore, the only issue is one of Florida law, appropriately decided on summary judgment.

Florida's section 531.40[2] gives the Department of Agriculture and Consumer

---

1. Gasoline expands as its temperature increases and therefore its volume changes. Temperature compensation is a measurement technique—taking the actual gallon volume of an amount of gasoline at a certain temperature and estimating its volume in gallons at 60°F.

2. 531.40. Technical requirements for commercial devices

The specifications, tolerances, and other technical requirements for commercial weighing and measuring devices, as determined by regulations adopted by the department, which regulations shall afford the greatest degree of protection to the public, shall conform to those adopted by the National Bureau of Standards to the extent possible. The department, notwithstanding the provisions of chapter 120, shall have the power to adopt by reference in a regulation or regulations adopted by it the specifications, tolerances, and technical requirements approved by the National Conference on

Services the authority to adopt regulations relating to specifications, tolerances, and other technical requirements for commercial weighing and measuring devices. The parties agree that the Department has adopted by reference the specifications, tolerances, and technical requirements approved by the National Conference on Weights and Measures as published in National Bureau of Standards Handbook 44. The relevant provisions of Handbook 44 appear in section 3.30 and provide as follows:

> UR.3.5.1. USE OF AUTOMATIC TEMPERATURE COMPENSATORS.— If a wholesale device is equipped with an automatic temperature compensator, this shall be connected, operable, and in use at all times. Such automatic temperature compensator may not be removed, nor may a compensated device be replaced with an uncompensated device, without the written approval of the weights and measures authority having jurisdiction over the device.
>
> UR.3.5.2. INVOICES.—Any invoice based on a reading of a wholesale device that is equipped with an automatic temperature compensating system shall have shown thereon that the volume delivered has been adjusted to the volume at 60°F. The invoice issued from an electronic wholesale device equipped with an automatic temperature compensating system shall also indicate the API specific gravity or coefficient of expansion, product temperature, and gross reading.

Relying on these provisions, Dealers argue that if the temperature compensating device is affixed, then the dealers must be invoiced on the basis of the temperature compensated volume as adjusted to the volume at 60°F. Mobil argues that there is no such requirement that the billing be made on a temperature compensated basis.

The Department is charged with enforcing and interpreting chapter 531. Fla.Gen. Stat. § 531.41(2), (3). It is undisputed that the Department's interpretation, consistent since at least 1973, supports Mobil Oil's position. According to the Department, temperature compensated billing is optional, and, if the oil company chooses to bill on the basis of temperature compensated volume, the invoice must disclose that it is based on such an adjustment.

Under Florida law, the interpretation of the agency charged with interpreting and enforcing a statute is entitled to great deference.[3] *Dep't of Envtl. Regulation v. Goldring*, 477 So.2d 532, 534 (Fla.1985); *Pan Am. World Airways v. Florida Pub. Serv. Comm'n*, 427 So.2d 716, 719 (Fla. 1983). If the Department's interpretation is not "clearly erroneous," *Pan Am. World Airways*, 427 So.2d at 719,[4] then courts are required to defer to that interpretation.

We conclude that the Department's interpretation is not only reasonable, but also is the most reasonable reading of the regulation. It is clear that the decision whether or not to attach a temperature compensating device is completely optional. U.R.3.5.-1. provides: "*If* a wholesale device is equipped with an automatic temperature compensator...." (Emphasis added). The optional nature of the requirement is consistent with the Department's interpretation of the purpose of the regulation, namely, to ensure that the oil companies do not utilize temperature compensated billing only when it would be beneficial to them. Similarly, a plain reading of U.R.3.5.2. is

Weights and Measures and published in Handbook 44 of the National Bureau of Standards. The department may, from time to time, adopt such regulations as may be necessary to conform the state standards to those of the National Bureau of Standards, which may be adopted by reference to supplements to, or revisions of, the National Bureau of Standards, Handbook 44.

3. Florida law is consistent with the general law on the subject of deference to an agency's interpretation of the statute it is charged with enforcing. *See Griggs v. Duke Power Co.*, 401 U.S. 424,

433–34, 91 S.Ct. 849, 854–55, 28 L.Ed.2d 158 (1971); *Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Usery v. Tamiami Trail Tours*, 531 F.2d 224, 230 (5th Cir.1976).

4. We construe the "clearly erroneous" test, as used in *Pan Am. World Airways*, to require the same level of scrutiny of the Department's interpretation as the requirement that the interpretation be reasonable.

consistent with the Department's interpretation. *"Any invoice based on a reading of a wholesale device that is equipped with an automatic temperature compensating system shall have shown thereon that the volume delivered has been adjusted to the volume at 60°F."* The most reasonable reading of this sentence is a requirement that, *if* billing is based on a temperature compensated reading, the same must be disclosed.[5] This is consistent with the purpose of the regulation as interpreted by the Department: to require consistency in using the temperature compensated billing method, and to prevent the oil companies from shifting methods when it would be beneficial to do so.

Since we conclude that the Department's interpretation of the regulation is reasonable, the judgment of the district court is AFFIRMED.

---

**5.** The Department's interpretation is supported further by the provisions in Handbook 44 which address measuring and sale of liquified petroleum gas ("LPG"), which is not gasoline. Paragraphs U.R.2.4.1. and U.R.2.4.3. of the LPG regulations are identical to paragraphs U.R.3.5.1. and U.R.3.5.2. of the motor fuel regulations. However, in the LPG section there is an additional paragraph not found in the motor fuel section—a provision which explicitly requires that sales of LPG be based on the temperature compensated volume. Thus, unlike motor fuels, if an LPG measuring device is equipped with a temperature compensating device, the subsequently issued invoice must be based on the temperature compensated volume. If we were to adopt the Dealers' reading of U.R.3.5.1. and U.R.3.5.2., the additional LPG provision would be superfluous, rendering such an interpretation contrary to generally accepted rules of statutory construction. *See Gulf Life Insur. Co. v. Arnold,* 809 F.2d 1520, 1524 (11th Cir.1987); *Terrinoni v. Westward Ho!,* 418 So.2d 1143, 1146 (Fla. 1st Dist.Ct.App.1982).