United States Court of Appeals,

Eleventh Circuit.

No. 94-6906.

Troy HOPKINS, individually and on behalf of all BP/Gulf dealers
in Alabama, Herbert Sharpe, individually and on behalf of all
BP/Gulf dealers in Alabama, John Mann, individually and on behalf
of all BP/Gulf dealers in Alabama, Plaintiffs-Appellees,

Robert Shaw, individually and on behalf of all BP/Gulf dealers in
Alabama, Sherry Shaw, individually and on behalf of all BP/Gulf
dealers in Alabama, Tom Pool, individually and on behalf of all
BP/Gulf dealers and Exxon dealers in Alabama, Terry Palamotos,
individually and on behalf of all BP/Gulf dealers and Exxon dealers
in Alabama, Plaintiffs,

v.

BP OIL, INC., Defendant-Appellant,

Exxon Corporation, Chevron USA, Inc., Defendants.

April 26, 1996.

Appeal from the United States District Court for the Middle
District of Alabama. (No. CV-88-V-1055-N), Robert E. Varner, Judge.

Before TJOFLAT, Chief Judge, COX, Circuit Judge, and WELLFORD[*],
Senior Circuit Judge.

PER CURIAM:

BP Oil, Inc. ("BP") sells gasoline to gasoline station
operators for them to re-sell to the public. In this diversity
case, three gasoline station operators (the "dealers") sued BP
under Alabama law for breach of contract and breach of statutory
obligation, among other claims. The dealers alleged that, by
billing them based on gross gallons of gasoline rather than based
on temperature-compensated gallons of gasoline, BP breached the
parties' contracts and its obligation under User Regulation 3.5

[*]Honorable Harry W. Wellford, Senior U.S. Circuit Judge for
the Sixth Circuit, sitting by designation.

("U.R. 3.5") of National Bureau of Standards Handbook 44. A jury returned a verdict for the dealers on each of their claims. BP appeals, and we reverse the judgment entered on those verdicts.

## I. FACTS

BP began operating in Alabama on February 1, 1985, when it acquired certain Gulf facilities in Alabama and assumed Gulf contracts to supply gasoline to Gulf-brand gas stations in Alabama. The dealers were operators of Gulf-brand gas stations in Alabama who began buying gasoline from BP when it assumed Gulf's contracts. The dealers eventually executed renewal contracts with BP.

Gasoline's volume varies according to its temperature. Volume expands as temperature rises; volume contracts as temperature falls. To account for gasoline consistently despite fluctuating temperatures, the American Petroleum Institute, a private trade organization, has established a voluntary standard of temperature compensation. Temperature compensation involves adjusting the actual volume of gasoline at a particular temperature to what its volume would be at 60 degrees Fahrenheit.

The Alabama Department of Weights and Measures has adopted National Bureau of Standards Handbook 44 and it was in effect during the relevant time period. U.R. 3.5 of Handbook 44 requires that any written invoice based on a reading of a wholesale measuring device equipped with an "automatic temperature compensator" show that the gasoline delivered has been adjusted to the volume at 60°F.[1] An "automatic temperature compensator"

---

[1]During the relevant time period, U.R. 3.5 read:

UR.3.5. TEMPERATURE COMPENSATION-WHOLESALE.

physically adjusts the volume of gasoline dispensed to equal the gallon amount that would be dispensed if the gasoline's temperature were 60°F.

Until February 1, 1988, BP billed the dealers and other Alabama retailers based on the number of gross gallons delivered. In addition to the number of gross gallons, BP's invoices to the dealers showed the gasoline's temperature when dispensed at BP's terminal, as well as its specific gravity. BP was able to record this information on its invoices because the loading line at its terminal was equipped with a temperature probe. The gasoline's temperature was sent automatically by computer to Cleveland, where BP processed the invoices. The invoices then were printed out at the selling terminal.[2] The contracts between the dealers and BP did not define "gallon." However, each dealer testified that he

---

UR.3.5.1. USE OF AUTOMATIC TEMPERATURE COMPENSATORS.—If a wholesale device is equipped with an automatic temperature compensator, this shall be connected, operable, and in use at all times. Such automatic temperature compensator may not be removed, nor may a compensated device be replaced with an uncompensated device, without the written approval of the weights and measures authority having jurisdiction over the device.

UR.3.5.2. WRITTEN INVOICES.—Any written invoice based on a reading of a wholesale device that is equipped with an automatic temperature compensator shall have shown thereon that the volume delivered has been adjusted to the volume at 60°F.

National Bureau of Standards Handbook 44, § 3.30 (1985).

[2]The invoices to commercial and industrial accounts and jobbers showed the number of temperature-compensated gallons as well. This number is calculated by multiplying the temperature of the gasoline by its specific gravity, and multiplying that product by the number of gross gallons. Thus, from the information on their invoices, the dealers could have calculated the number of temperature-compensated gallons delivered.

understood that he was receiving gross gallons of gasoline from BP, just as he had received gross gallons from Gulf.

In July of 1985, dealer Hopkins's accountant discovered an inventory shortage and informed Hopkins that the shortage probably was due to variations in temperature and gross billing. Hopkins wrote to BP requesting billing on a temperature-adjusted basis. The local BP representative told Hopkins that shortages and overages even out over the course of a year. After Hopkins wrote another letter requesting temperature-compensated billing, BP responded that it did not sell gasoline to dealers on a temperature-adjusted basis and that it would continue to bill Hopkins based on gross gallons.

## II. PROCEDURAL BACKGROUND

The dealers sued BP for breach of contract, breach of statutory obligation, and fraudulent suppression under Alabama law. Dealer Hopkins also sued BP for affirmative misrepresentation under Alabama law.

In their complaint, the dealers alleged that the dispensing equipment at BP's terminal was "equipped with automatic temperature compensating devices to measure the volume of motor fuel sold in an adjusted volume (as would have been dispensed at 60°F)." (Compl. at ¶ 13.) In its answer, BP stated: "BP is without sufficient information, knowledge or belief to admit or deny the allegations ... and, therefore, denies same. BP denies, in any event, that the dispensing equipment for sales to plaintiff is at the BP terminal." (Answer at ¶ 13.)

The dealers further alleged in their complaint that BP "had

invoiced ... according to volumes of gasoline measured at the ambient temperature at the terminal and had refused to temperature compensate the motor fuel sold." (Compl. at ¶ 16.) These billing practices allegedly violated Handbook 44. In addition, they allegedly violated the parties' contract "by charging them for a gallon of motor fuel when a gallon was not actually delivered when measured in accordance with said user regulations." (Compl. at ¶ 17.) The dealers alleged that they were overcharged from February 1, 1985, to February 1, 1988. (Compl. at ¶ 18.) BP denied these further allegations. (Answer at ¶ 16.)

The district court entered a scheduling order setting final deadlines for witness exchange and designation of experts. After holding a pretrial conference, the district court entered a pretrial order. Though the pretrial order purported to detail each party's contentions, the dealers did not explicitly contend in the order that BP had or used an "automatic temperature compensator," nor did BP explicitly contend that it did not have or use an "automatic temperature compensator."

Before trial, BP filed a motion in limine to preclude the dealers from introducing extra-contractual evidence as to the meaning of the term "gallon" in the contracts between BP and the dealers, contending that "gallon" is unambiguous. The district court denied BP's motion.

Ten days before trial, BP moved to add a new witness, Steve Gandee, to its witness list. Conceding that Gandee was identified after the district court's deadline for witness exchange, BP represented that Gandee was a substitute for a seriously ill

witness who could not attend trial.  Over the dealers' objection, the district court allowed BP to add Gandee to its witness list.

The dealers deposed Gandee on the Friday before the Monday on which trial began.  They learned at the deposition that BP disputed that it had "a device equipped with an automatic temperature compensator" within the meaning of U.R. 3.5.  The dealers moved to exclude Gandee's testimony, contending that BP had not disputed, in its answer, briefs, or other pretrial contentions, that it had an "automatic temperature compensator."  Thus, they argued, BP was unfairly changing its theory of the case on the eve of trial.  The district court agreed, refusing to allow Gandee or any other BP witness to testify at trial that BP did not have an "automatic temperature compensator."

The Director of the Alabama Department of Weights and Measures was permitted to testify at trial as to his interpretation of U.R. 3.5.  He opined that U.R. 3.5 requires invoices to show the temperature-compensated amount of gasoline sold if dispensed through a device equipped with an "automatic temperature compensator."  Presented with hypotheticals purporting to describe BP's dispensing equipment, he opined that BP had a device equipped with an "automatic temperature compensator."

At the close of the dealers' evidence, and again at the close of all the evidence, BP moved for judgment as a matter of law on all claims.  The district court denied the motion both times.  The jury returned a verdict for the dealers on each of their claims. The jury awarded dealer Hopkins $100,000 in compensatory damages, dealer Mann $150,000 in compensatory damages, and dealer Sharpe

$50,000 in compensatory damages. In addition, the jury awarded each dealer $200,000 in punitive damages. The district court denied BP's renewed motion for judgment as a matter of law. On BP's motion for a new trial or remittitur, the compensatory damage awards were reduced to $12,072.66 for Hopkins, $27,941.40 for Mann, and $2,462.40 for Sharpe. The punitive damage awards, however, were left intact.

## III. ISSUES ON APPEAL

We address four issues on appeal. First, whether the term "gallons" in the contracts between BP and the dealers is ambiguous. Second, whether U.R. 3.5 requires billing based on temperature-compensated gallons when gross gallons are delivered. Third, whether, for purposes of the dealers' fraudulent suppression claims, BP had an obligation to disclose the number of temperature-compensated gallons delivered. Fourth, whether the evidence was sufficient for a reasonable jury to conclude that dealer Hopkins reasonably relied to his detriment on BP's alleged affirmative misrepresentation.

## IV. STANDARDS OF REVIEW

Whether contract language is ambiguous is a question of law reviewed *de novo*. *Dunkin' Donuts of America, Inc. v. Minerva, Inc.*, 956 F.2d 1566, 1573 (11th Cir.1992). The interpretation of U.R. 3.5 is also a question of law reviewed *de novo*. *See Bolam v. Mobil Oil Corp.*, 893 F.2d 311, 312 (11th Cir.1990). We review *de novo* the district court's denial of a motion for judgment as a matter of law. *Sherrin v. Northwestern Nat'l Life Ins. Co.*, 2 F.3d 373, 377 (11th Cir.1993). In determining whether the dealers

submitted substantial evidence to present a jury question, we construe the evidence and permissible inferences in favor of the dealers. *Id.*

## V. DISCUSSION

A. *The Contractual Term "Gallon" Is Not Ambiguous*

BP contends that it is entitled to judgment as a matter of law on the dealers' breach of contract claims. BP argues that the district court erred in allowing the jury to determine the meaning of the contractual term "gallons." According to BP, "gallons" is unambiguous and refers to gross gallons, not temperature-compensated gallons. Thus, BP contends, it did not breach its contracts with the dealers by billing for gross gallons.

The dealers respond that "gallons" is ambiguous because BP itself used the term in two different ways: BP billed certain customers on a temperature-compensated basis and billed the dealers based on gross gallons. Moreover, they argue, Handbook 44 addresses temperature-compensated gallons, precluding a finding that "gallon" unambiguously means a gross gallon. They further argue that U.R. 3.5 constitutes an implied term of the contracts and requires temperature-compensated billing. For these reasons, they argue, the jury properly was allowed to determine whether BP breached its contracts by billing for gross gallons.

We hold that the district court erred in permitting the jury to determine the meaning of "gallons" in the contracts between BP and the dealers. "Gallon" is not ambiguous. "Gallon" refers to a gross gallon of gasoline. Thus, the contracts unambiguously did not require BP to bill the dealers based on temperature-compensated

gallons.  BP's failure to do so, therefore, was not a breach of contract.  The district court erred in denying BP's motion for judgment as a matter of law on the breach of contract claims.

B. *U.R. 3.5 Did Not Require Temperature-Compensated Billing*

BP contends that the district court erred in permitting the jury to determine the meaning of U.R. 3.5.  BP argues that the meaning of U.R. 3.5 is a question of law.  According to BP, the Eleventh Circuit has interpreted U.R. 3.5, albeit as adopted in Florida, to require neither temperature-compensated billing nor disclosure of temperature-compensated gallons when billing is not based on temperature-compensated gallons.  BP further argues that, even if U.R. 3.5 requires temperature-compensated billing, U.R. 3.5 did not apply to BP because BP did not have a device equipped with an "automatic temperature compensator."  The district court, BP contends, abused its discretion in excluding BP's evidence that it did not have an "automatic temperature compensator."

The dealers respond that the testimony of the Director of the Alabama Department of Weights and Measures is "[t]he official interpretation of the Alabama regulation during the time period in question," (Appellee's Br. at 20-21), and is entitled to deference. They argue that the Eleventh Circuit case interpreting U.R. 3.5 in Florida is distinguishable because that case did not involve a company billing some customers on a temperature-compensated basis while billing others on a gross-gallon basis.  Finally, they argue that the district court properly excluded the testimony of Gandee and BP's other evidence that BP did not have a device equipped with an "automatic temperature compensator."

The meaning of U.R. 3.5 is a question of law. Therefore, the district court erred in allowing the jury to interpret U.R. 3.5. Interpreting U.R. 3.5 *de novo,* we hold that U.R. 3.5 did not require temperature-compensated billing under the undisputed facts of this case. The district court erred in denying BP's motion for judgment as a matter of law on the breach of statutory obligation claims.

U.R. 3.5 requires temperature-compensated billing only if the customer is billed for a temperature-compensated volume of gasoline. *Bolam,* 893 F.2d at 314.[3] The purpose of U.R. 3.5 is to require consistency in billing methods so oil companies do not change methods when beneficial to them. *Id.*[4] For example, U.R. 3.5 would prohibit a company from billing a customer for 1000 gross gallons when it delivered 1000 temperature-compensated gallons; the company would have to disclose that the delivered gallons were temperature-compensated gallons.

BP did not deliver temperature-compensated gallons yet bill for gross gallons. To the contrary, it is undisputed that BP billed the dealers for the gross volume of gasoline delivered.

[3]We reject the dealers' contention that the trial testimony of an agency official constitutes the official interpretation of a regulation and is entitled to deference from a court.

[4]In attempting to distinguish *Bolam,* the dealers argue that U.R. 3.5 requires BP to bill the dealers based on temperature-compensated gallons because it bills certain other customers on that basis. This argument reflects a fundamental misunderstanding of the purpose and meaning of U.R. 3.5. U.R. 3.5 is not concerned with billing consistency between different types of customers. Rather, U.R. 3.5 ensures that each customer is billed consistently. If a customer receives temperature-compensated gallons, it must be billed for temperature-compensated gallons; if it receives gross gallons, it must be billed for gross gallons.

Thus, U.R. 3.5 did not require BP to show on its invoices the number of gallons that would have been delivered if they had been temperature-compensated.[5] BP therefore did not breach any statutory obligation in only showing the number of gross gallons delivered.[6]

C. *BP Had No Duty To Disclose For Purposes Of The Dealers' Fraudulent Suppression Claims*

BP contends that the district court erred in denying its motion for judgment as a matter of law on the dealers' fraudulent

---

[5]This conclusion disposes of the dealers' argument in support of their breach of contract claims that U.R. 3.5 was an implied term in the contracts between BP and the dealers. Even if U.R. 3.5 was an implied term, it did not require temperature-compensated billing.

[6]Because we hold that U.R. 3.5 did not require BP to bill the dealers on a temperature-compensated basis, regardless of whether BP had an "automatic temperature compensator," we need not address BP's contention that the district court erred in excluding BP's evidence that it did not have an "automatic temperature compensator." Without addressing the merits of this contention, however, we express our disapproval of the pretrial conduct of counsel for all parties relative to this issue.

Whether BP had an "automatic temperature compensator" was a potentially dispositive issue as to all of the dealers' claims. Nevertheless, the dealers' complaint failed to explicitly allege that BP had an "automatic temperature compensator," that is, a device that physically adjusts the volume of gasoline dispensed to the volume that would be dispensed at 60°F. BP's answer to the complaint stated that it was "without sufficient information, knowledge or belief" to answer as to what type of equipment it had. (Answer at ¶ 13.) Similarly, the dealers' contentions as set forth in the pretrial order do not explicitly include the contention that BP had an "automatic temperature compensator." Once again, in its statement of contentions in the pretrial order, BP fails to say that its equipment was not an "automatic temperature compensator."

The district court's decision to exclude BP's evidence that its device was not an "automatic temperature compensator" was based on its belief that BP had waited until the eve of trial to dispute this issue. We express no opinion on the propriety of this decision.

suppression claims.  BP argues that it had no obligation to communicate any material fact under Ala.Code § 6-5-102 (1993) because U.R. 3.5 did not require it to disclose the number of temperature-compensated gallons delivered to the dealers.  The dealers respond that U.R. 3.5, as well as BP's superior knowledge of billing methods and requirements, imposed on BP a duty to disclose temperature-compensated gallons.

A fraudulent suppression claim requires, *inter alia,* the existence of an obligation to communicate.  Ala.Code § 6-5-102 (1993).  The dealers' fraudulent suppression claims are premised on BP's alleged duty under U.R. 3.5 to bill on a temperature-compensated basis.  We have already held that U.R. 3.5 did not require temperature-compensated billing by BP.[7]  Therefore, BP had no obligation to communicate the number of temperature-compensated gallons delivered to the dealers.  The dealers' fraudulent suppression claims fail as a matter of law.

D. *The Evidence Was Insufficient For The Jury To Conclude That Hopkins Reasonably Relied On BP's Alleged Affirmative Misrepresentation*

BP contends that the district court erred in denying its motion for judgment as a matter of law on dealer Hopkins's affirmative fraud claim.  According to BP, its representative's statement to Hopkins that inventory shortages even out over the course of the year was not a misrepresentation of a material fact; rather, it was an opinion as to a future event that, BP argues,

---

[7]Nor did BP have an obligation to communicate based on its superior knowledge of either U.R. 3.5, how other customers were billed, or the significance of temperature compensation.  The dealers' contention that such knowledge gave rise to a duty to disclose temperature-adjusted gallons is meritless.

turned out to be true. Moreover, BP argues, Hopkins's reliance on the statement, if any, was unreasonable, and there was no proof that Hopkins was injured as a proximate result of the statement. The dealers respond that the fact that BP internally accounts for the spread between temperature-compensated gallons and gross gallons shows that BP knew that shortages did not even out. They argue that the issue of the reasonableness of any reliance was for the jury.

An essential element of affirmative misrepresentation under Alabama law is proof that plaintiff acted on or relied on the misrepresentation to his detriment. Ala.Code § 6-5-101 (1993); *Taylor v. Moorman Mfg. Co.,* 475 So.2d 1187, 1189 (Ala.1985). The reliance must be reasonable under the circumstances. *Taylor,* 475 So.2d at 1189. Our review of the record reveals that Hopkins did not present any evidence that he reasonably relied to his detriment on BP's statement that shortages even out over the course of a year.[8]

After BP's statement, Hopkins wrote a second letter to BP requesting temperature-compensated billing, complaining that his problem with shortages was continuing. Thus, Hopkins did not decide, based on BP's statement, that gross billing was

---

[8]We note that the complaint was of no use in our search of the record for evidence of detrimental reliance, for it does not allege affirmative misrepresentation at all, much less any particulars as to how Hopkins relied on the misrepresentation. Nor does the pretrial order describe how Hopkins relied to his detriment on BP's statement. Nor do the parties' briefs on appeal suggest what Hopkins did or decided not to do in reliance on BP's statement. Nevertheless, we have trudged through this procedural bog in search of evidence of some kind of detrimental reliance.

satisfactory and abandon further attempts to receive temperature-compensated billing. He did not ask his accountant whether BP's statement was accurate and shortages actually were evening out. Hopkins did not testify that he renewed his contract with BP based on his understanding that shortages even out, or that he would not have renewed his contract if he had known that shortages do not even out. He did not testify that he would have changed his orders for gasoline but for BP's statement. Indeed, Hopkins did not testify that he would have done *anything* differently if BP had not made the allegedly false statement.

Because Hopkins presented no evidence from which a reasonable jury could find that he detrimentally relied on BP's statement, the district court erred in not granting BP's motion for judgment as a matter of law on the affirmative misrepresentation claim.

### VI. CONCLUSION

Because the district court erred in denying BP's motion for judgment as a matter of law on all of the dealers' claims,[9] we reverse the district court's judgment.

REVERSED and RENDERED.

---

[9]BP also claims on appeal that the trial judge's conduct at trial was unfair and prejudicial. In view of our resolution of the other issues presented by BP on appeal, we need not address this question.